**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

**DAVID STEBBINS**                                                          **Appellant**

**VS.**                                        **CASE NO. 15-2880**

**BOONE COUNTY, AR**                                              **AppelleeS**

<u>**APPELLANT BRIEF**</u>

Comes now, *pro se* Appellant David Stebbins, who hereby submits the following

Appellant Brief in the abovey-styled action.

**TABLE OF CONTENTS**

|     | **Section** | **Page** |
| --- | --- | --- |
| 1. | Table of Contents | 1 |
| 2. | Table of Authorities | 3 |
| 3. | Jurisdictional Statement | 6 |
| 4. | Statement of Issues | 7 |
| 5. | Statement of the Case | 8 |
| 6. | Summary of Argument | 28 |
| 7. | Argument | 29 |
|     | (a) Dismissal of arrest claim for want of policy | 29 |
|     | (b) Discovery Violation | 33 |
|     | (c) Dismissal of 1st Amendment Claim | 34 |
|     | (d) Dismissal of 13th Amendment Claim | 36 |
|     | (e) Dismissal of claim over bond denial | 39 |
|     | (f) Magistrate Judge's Report & Recommendation After Evidence Hearing | 41 |

    (g) Sua Sponte Dismissal for Insufficient Complaint      44

    (h) District Judge's Ruling Against Clear Weight of      45
          Evidence

8.   Conclusion      47

9.   Certificate of Compliance      48

# TABLE OF AUTHORITIES

| Statutes & Rules | Page(s) |
| --- | --- |
| 28 USC § 1291 | 6 |
| 28 USC § 1915(e) | 44 |
| 28 USC § 1331 | 6 |
| 42 USC § 1983 | 20 |
| 42 USC § 12203 | 20 |
| A.C.A. § 16-90-1401 | 25 |
| A.C.A. § 16-90-1417(b)(1) | 25 |
| A.C.A. §§ 16-93-301, et seq. | 25 |
| Fed.R.App.P. 4(a)(4)(A)(iv) | 6 |
| Fed.R.App.P. 28(a)(8) | 29 |
| Fed R.App.P. 32(a)(7)(B) | 48 |
| Fed.R.App.P. 32(a)(7)(B)(iii) | 48 |
| Fed.R.Civ.P. 72(a) | ## |
| Federal Rule of Evidence 408(b) | 20 |
| Federal Rule of Evidencee #410 | 21 |

| Case Law | Page(s) |
| --- | --- |
| *Adarand Constructors, Inc. v. Pena*, 515 US 200 (1995) | 35 |
| *Bell v. Wolfish*, 441 US 520 (1979) | 11,34,35 |
| *Brady v. Maryland*, 373 US 83 (1963) | 30 |
| *Heck v. Humphrey*, 512 U.S. 477 (1994) | 31 |
| *Johnson v. Douglas County Medical Dept.*, | 42 |

725 F. 3d 825 (8th Cir. 2013)

*Kern v. TXO Production Corp.*,                                        33,37
738 F. 2d 968 (8th Cir. 1984)

*Kuehl v. Burtis*, 173 F. 3d 646 (8th Cir. 1999)                       19,29,30

*McGarry v. Pallito*, 687 F. 3d 505 (2nd Cir. 2012)                    36

*Putman v. Gerloff*, 639 F. 2d 415 (8th Cir. 1981)                     16

*Roe v. Wade*, 410 US 113 (1973)                                       35

*Tolan v. Cotton*, 134 S. Ct. 1861 (2014)                             40

*United States v. Kramer*,                                            33
827 F. 2d 1174 (8th Cir. 1987)

*US ex rel. Miller v. Weston Educational, Inc.*,                       40
784 F. 3d 1198 (8th Cir. 2015)

*White v. McKinley*, 519 F. 3d 806 (8th Cir. 2008)                     23,25

*Delaware v. Van Arsdall*, 475 US 673 (1986)                          39

*Foman v. Davis*, 371 US 178 (1962)                                    38

*Gulf Oil Co. v. Bernard*, 452 US 89 (1981)                            38

*Jarrett v. ERC Properties, Inc.*, 211 F. 3d                           38
1078 (8th Cir. 2000)

*Press-Enterprise Co. v. Superior Court of Cal.*,                      39
*Riverside Cty.*, 464 US 501 (1984)

*Purcell v. Gonzalez*, 549 US 1 (2006)                                 39

*Rayes v. Johnson*, 969 F. 2d 700 (8th Cir. 1992)                     38

*Slaughter v. City of Maplewood*, 731 F. 2d                            38
587 (8th Cir. 1984)

*Thongvanh v. Thalacker*, 17 F. 3d 256 (8th Cir. 1994)                38

*United States v. Grinnell Corp.*, 384 US 563 (1966)                  39

*US v. Burrell*, 622 F. 3d 961 (8th Cir. 2010)                    37

*US v. Walters*, 643 F. 3d 1077 (8th Cir. 2011)                   38

## JURISDICTIONAL STATEMENT

For the reasons set forth below, this Court has jurisdiction over this appeal.

### Basis for District Court's Jurisdiction.

The District Court had jurisdiction over the underlying dispute, pursuant to 28 USC § 1331.

### Basis for Court of Appeals' Jurisdiction.

This Court has jurisdiction to hear this appeal. See 28 USC § 1291.

### Timeliness of appeal

This appeal was filed less than thirty days after the District Court entered its order denying Appellant's Motion for Reconsideration. Therefore, this appeal is timely. See Fed.R.App.P. 4(a)(4)(A)(iv).

### Finality of judgment

This appeal is being brought of a final judgment.

**STATEMENT OF ISSUES**

1.      Appellant was unfairly deprived of his right to discovery.

2.      Appellant's claim for First Amendment censorship was improperly summarily dismissed for want of evidence.

3.      Appellant's claim for 13th Amendment involuntary servitude was improperly summarily dismissed for want of evidence.

4.      Appellant's claim for preventing Appellant from posting bail was improvidently dismissed for want of evidence.

5.      The Magistrate Judge's Report & Recommendation was against the clear wait of evidence.

6.      District Judge Brooks had no authority to dismiss the case due to an insufficiently-drafted complaint, as that issue had long since been resolved before he was even appointed to the bench.

7.      District Judge Brooks' finding of fact that Appellant had not alleged sufficient facts, in his complaint, to support a finding of unconstitutional policy or custom was against the clear wait of evidence.

## STATEMENT OF THE CASE

1.    On November 24, 2011, Appellant was arrested by the Boone County Sheriff's Department.  Officially, the arrest was for domestic battery, but outside of the official, written pleadings, they made no effort to even *pretend* like the charges were a pretextual excuse to harass Appellant. Why were they harassing him? Because Appellant had filed some *pro se* lawsuits in the past, and they do not like that.

2.    While subjected to pre-trial incarceration, Appellant was subjected to a wide amount of abuse. Jason Jones was the most prevalent offender, as he was one of the people Appellant filed a lawsuit against (see Case No. 10-3041 in the U.S. District Court for the Western District of Arkansas).  The most extreme form of this abuse (but not the last time it happened) was getting a mop bucket thrown in Appellant's face by some inmates who were acting under Jones' Discretion.

3.    On February 17, 2012, Appellant filed a Complaint and Jury Demand against Boone County, Arkansas in the United States District Court for the Western District of Arkansas. It was given Case No. 12-3022.  Appellant was granted leave to proceed *in forma pauperis* and the case commenced.

4.    After a small amount of discovery, Appellant filed three (3) Motions for Partial Summary Judgment.

   (a)    One asked for the Court to issue summary judgment on the claim that the jail's officers refused to allow Appellant to post bail to be released from jail, so they could harass him some more.

   (b)    The second one asked the District Court to declare that the jail's policy of requiring inmates to show respect and courtesy to the jail guards was a violation of Appellant's 1st

Amendment right to free speech, since it did not appear to serve any legitimate security interest, but rather, seemed designed solely for the purpose of asserting dominance over inmates, entirely for its own sake, like a common bully.

(c)     The third asked the Court to declare that the jail's policy of forcing inmates to clean, for no pay, just to save the jail the cost of employing housekeepers, was an unconstitutional violation of Appellant's 13th Amendment right of involuntary servitude, since Appellant was not convicted of his charges. The 13th Amendment prohibits, not only slavery (which, in this nation, has historically been drawn across racial lines), but also "involuntary servitude, except as punishment for a crime where the criminal has been duly convicted).  Since Appellant was only in *pre-trial* incarceration, the exception in the plain text of the Amendment was not applicable.

5.     The Appellees, in addition to filing Responses in Opposition to Appellant's Motions for Partial Summary Judgment, filed their own Motions for Summary Judgment, asking the Court to summarily *dismiss* the three claims Appellant sought summary judgment on. Their arguments were thus:

(a)     Ont he claim for refusing to allow Appellant to post bail bond, they issued several sworn statements that it was a mere accident, and that they genuinely were following the State Court's bonding requirements. They offered absolutely no actual *evidence* beyond their interested word.

(b)     On the claim for 1st Amendment censorship, they claimed that their policies served a security.  However, they offered absolutely zero empirical *evidence* to support their claim that it served that purpose, nor did they offer any explanation as to how their policy was the least restrictive means of achieving this interest (as is required by the "strict scrutiny" analysis).

(c)     On the claim for involuntary servitude, they argued that it did not violate the 8th Amendment because it kept the jail clean. When Appellant filed is reply, clarifying that his claim was for a violation of the 13th Amendment, not the 8th, they filed a surreply, citing cases that A) were not binding precedent, and B) still featured Appellants who had been convicted of their crimes, so they were not applicable in the instant case.

6.     The Magistrate Judge issued a single Report & Recommendation on all three of those motions, simultaneously. In that R&R, he stated the following:

(a)     On the claim for refusal to post bond, he wrote that the evidence (which basically amounted to the jail guards' sworn statements) suggested that they were simply negligent in their failure to allow Appellant to post bond. Negligence, alone, was insufficient to support a Section 1983 claim, and therefore, Appellant's claim must be dismissed.

(b)     On the claim for 1st Amendment Censorship, he wrote that the 1st Amendment Censorship claim was not to be reviewed under strict scrutiny because it served a "legitimate penological interest." In other words, Appellant was being punished for his crimes.

(c)     On the claim for involuntary servitude in violation of the 13th Amendment, he wrote that even pre-conviction involuntary servitude is constitutional, on the grounds that it *could*, theoretically, serve some sort of theraputic purpose.

7.     Appellant filed an Objection to the Magistrate Judge's Report & Recommendation, arguing the following:

(a)     Negligence, as opposed to malice, on the part of the Appellee was disputed because the Appellee offered no evidence whatsoever, aside from the interested testimony of her officers'. Since they have a judicially-noticeable interest in the outcome of the case, their testimonies are inherently suspect.  It is the jury's province – not the judges' – to decide

whether a witness is telling the truth, or if they are filthy, filthy liars.

(b)     On the issue of 1st Amendment censorship, Appellant has the right to not be punished during pre-trial incarceration. See *Bell v. Wolfish*, 441 US 520 (1979).

(c)     On the issue of the 13th Amendment violation, the Magistrate Judge's recommendation must fail because …

    i.      There is no evidence that their policy of "inmate slave labor" was designed, even at the conceptual level, for such a purpose. Indeed, the persuasive precedent from the 2nd Circuit that the Magistrate Judge uses to support his recommendation clearly held that jail's similar policy as unconstitutional *because* there was no evidence that that jail was doing it for any purpose other than "cheap labor."

    ii.     There was no legal citation showing that the jail's alleged interest in promoting theraputic anything overrode Appellant's right to be free from involuntary servitude unless and until he is convicted.

8.     District Judge P.K. Holmes then entered an order stating the following:

(a)     On the issue of refusal to allow Appellant to post bail, he said "Judging from the record, it does not appear that the Appellees were even negligent." He then asserted that, even if Appellant could show some evidence that they acted with malice, there was also no evidence of unconstitutional policy or custom of not allowing inmates to post bond to be released from pre-trial incarceration.

(b)     On the issue of 1st Amendment Censorship, he stated that allowing inmates free speech would create an "obvious security risk." He never offered any emperical evidence to support this finding of fact; rather, it appears that Holmes is of the belief that his declaration, alone, makes it true and undisputed.  His word is absolute truth, absolute law, and absolute

right, even if those same statements would not be undisputed if stated by anyone else but him, like in the famous dystopian novel, "Nineteen Eighty-Four[1]."

(c)      On the issue of the 13ᵗʰ Amendment violation, all he said was that Appellant's objections were "entirely without merit." He gave absolutely no details or legal citations, whatsoever, beyond that.

9.      He then proceeded to grant the Appellees' Motions for Summary Judgment – all three of them – on the aforementioned grounds.  This not only meant that Appellant was denied summary judgment, but he was also denied, forever, his day in court on those claims, even if he could prove them at a later date!

10.      Discovery continued in the case, on the remaining claims. An evidence hearing was set by the Court, sua sponte, to determine if there was enough evidence to support a verdict either way.

11.      A few months before that discovery happened, Appellant – knowing that he needed to show evidence of an unconstitutional policy or custom of jail administration consistently ignoring complaints against jail guards – submitted a discovery request to the Defense, demanding that they produce three (3) randomly selected cases, per year, for the past five (5) years (for a total of 15 cases), where a complaint, filed by an inmate against a jail guard was

---

1   The villains of that book constantly declared that something was true *because* they claimed it to be true. At one point, the main villain said "We control matter because we control the mind. Reality is inside the skull ... There is nothing that we could not do. Invisibility, levitation—anything. I could float off this floor like a soap bubble if I wish to. I do not wish to, because the Party does not wish it. You must get rid of those nineteenth-century ideas about the laws of Nature. We make the laws of Nature.

…

'There are five fingers there. Do you see five fingers?'
'Yes.'
And he did see them, for a fleeting instant, before the scenery of his mind changed. He saw five fingers, and there was no deformity. Then everything was normal again, and the old fear, the hatred, and the bewilderment came crowding back again. But there had been a moment—he did not know how long, thirty seconds, perhaps—of luminous certainty, when each new suggestion of O'Brien's had filled up a patch of emptiness and become absolute truth, and when two and two could have been three as easily as five, if that were what was needed."

actually investigated beyond simply asking the respondent if the accusations were true.

12.     Appellant knew, because of his own personal experience at that jail, that if they had to produce these records, they would be forced to admit that the records do not exist.  In other words, they would be forced to admit that it is their unofficial custom – regardless of what their official policies say – to completely ignore complaints raised by inmates. The closest they will ever get, under any circumstances, to investigating such a complaint was merely *asking* the respondent if the accusations were true, and when that jail guard denied it, then no further investigation would be launched. No security camera footage viewed, no extra witnesses talked to, not even asking the respondent him/herself any more specific questions! The respondent denies it, and that, alone, is taken as incontrovertible proof of innocence.

13.     The Appellees placed a vague objection to this discovery request on the grounds that it was "not reasonably calculated to lead to the discovery of admissible evidence." Appellant filed a Motion to Compel Discovery on that objection, claiming that, because the Appellees did not state the grounds for their objection with specificity, the objection is insufficient under both the Local Rules and the Federal Rules of Civil Procedure.

14.     Magistrate Judge Marchewski granted Appellant's Motion to Compel Discovery, and the Appellees, on January 23, 2015, filed a *new objection*, saying that compliance with that discovery request would present an undue burden.

15.     Appellant filed another Motion to Compel Discovery and for Rule 37(d) sanctions, arguing that, because they did not raise that dispute when they first had the chance, they have lost their opportunity to raise it period.

16.     The Magistrate Judge denied Appellant's Motion to Compel Discovery, but on the grounds that the objection was "sufficient." The argument that the objection was untimely, and

therefore, not properly before the Court in the first instance, was left entirely addressed.

17.     Appellant filed an objection to the Magistrate Judge's ruling.

18.     A few days later, Timothy Brooks was assigned as the new district judge in place of P.K. Holmes.

19.     So the case went to evidence hearing. The hearing was audio recorded without a court reporter. Appellant has uploaded the audio recordings for the 2-day evidence hearing to Youtube. This Court can listen to them at the following links:

**Exhibit A: Day 1 in its entirety:**
https://www.youtube.com/watch?v=9fYyml0q6dI

**Exhibit B: Day 2 in its entirety:**
https://www.youtube.com/watch?v=h5aPapKgp2A

20.     During the evidence hearing, Appellant introduced more than 600 pages worth of exhibits. Appellant will be attaching those documents, as PDF files, when he uploads this brief. For purposes of this brief, however, Appellant is restricted to 14,000 words, and so, to stay under that limit, Appellant will only provide some of the evidence that was presented at that hearing.

21.     During the evidence hearing, the following evidence was presented:

22.     Jason Day was the first witness to be called. He testified thusly:

    (a)     He freely admitted that he receives complaints all the time from inmates containing allegations of harassment, verbal abuse, and even threats coming from officers, and by his own admission, he does not look into them, but rather, will not step in unless there is physical abuse coming from the officers. See Day 1 at 00:28:06 – 00:28:33.

    (b)     Jason Day also admits that, although the allegation of the death threat was turned over to the CID for investigation, he does not believe there was, in fact, an investigation about it. See Day 1 at 00:53:40 – 00:54:08. This is consistent with Appellant's accusation that the jail

has a custom of ignoring complaints against officers.

23.     Danny Hickman took the stand and testified thusly:

(a)     Danny Hickman states that he knows what things go into a police officer's training. That being said, he testifies that police officers in the State of Arkansas are trained to exercise discretion in three areas:

   i.     To arrest a suspect only after viewing all evidence in their immediate range (in other words, officers have discretion to arrest suspects before conducting reasonably thorough investigations that take into consideration the totality of the circumstances). See Day 1, 01:39:25 – 01:40:37.

   ii.     To afford all persons a full opportunity to tell their side of the story before arresting anyone (again, it is Hickman's policy to afford deputies discretion to arrests before conducting reasonably thorough investigations). See Day 1, 01:40:38 – 01:40:56.

   iii.     To confiscate relevant evidence, so it can be preserved (so that the Defendant can inspect it under the adversarial process). See Day 1, 01:40:56 – 01:41:45.

24.     Appellant himself then took the stand and testified thusly:

(a)     The jail has an unofficial custom[2] of always ignoring inmate complaints.  They will always trust the word of jail guards over the inmates, and the reason for that is "they're the officer,s and you're the inmate.  That means that you're scum, and these officers are automatically trustworthy." See Day 1 at 2:10:54 – 2:11:56.

(b)     Appellant testified that, on November 25-30, 2011, Jones constantly harassed Appellant by issuing snide insults to Appellant, asking how several of Appellants lawsuits were "going," suggesting that Appellant doesn't have any friends, holding up signs in

---

2   This means that, although they have a WRITTEN POLICY that, on its face, purports to catch corruption very thoroughly, those are just words.  Their actions – as in, their actual, physical ACTIONS – are completely the opposite of what the written policies say.

Appellant's window that said "You're going to get ass-raped." He would advise Appellant "I babysit sixty of you vaginas every day," and make various other snide comments towards Appellant. See Magistrate Judge's Report & Recommendation.

(c)     Appellant testified that, on December 14, 2011, Jones threatened to cripple Appellant if Appellant tried to sue him again, calling Appellant a "god damned basket case," a "cocksucker," and saying that he would "beat [Appellant] so hard [he] won't be able to crawl out of here." See Magistrate Judge's Report & Recommendation.

25.     Appellant testified that several other jail guards, besides Jones, would constantly threaten Appellant, tacitly authorize inmates doing so, or even directly instruct other inmates to do so. These incidents include the following:

(a)     On November 24, 2011, Jason Jones was harassing Appellant within earshot of Jason Day, and Jason Day, despite being close enough to hear the harassing comments, clearly did not step in, of his own accord, to put a stop to Jones' harassment, consistent with his duty to intervene as set established in *Putman v. Gerloff*, 639 F. 2d 415, 423 (8th Cir. 1981). See Appellant's Exhibit D(1)(d) and the accompanying testimony found on Day 1, 02:46:01 – 02:47:40, where Appellant explains the significance of this map.

(b)     A jail guard not caring about sexual harassment, but instead, making the impossible-to-follow suggestion that Appellant simply "stay away from his cell," so that she would not have to get out of her chair to actually do her job. See Appellant's Exhibits E(3)(a) & E(3)(b). See also the accompanying testimony offered on Day 1, at 02:50:31 – 02:51:43.

(c)     Appellant introduced an instance where his shower soap was stolen while he was in court. The jail guards did not care (because they were too lazy), and instead simply suggested that Appellant protect his own property, even when he was in court and thus couldn't protect

it. See Appellant's Exhibit E(4) and the accompanying testimony on Day 1, at 02:51:56 – 02:53:17.

(d)      One guard even threatened to kill Appellant herself, a threat which she communicated by moving her thumb across her neck if Appellant even "thinks" about disrespecting her. See Appellant's Exhibit E(5) and the accompanying testimony at 02:53:20 – 2:56:34.

   i.      Of special note, on this exhibit, is Marchewski's comment when the Defense objected to the exhibit. When the defense attorney objected on the grounds that it did not appear reasonably related to the disputes Appellant was suing over, Marchewski explained "Well, he's trying to show a *pattern* of abuse, here." See Day 1 at 2:54:36 – 2:54:53. This eliminates the possibility that Marchewski's failure to consider this evidence was in good faith. He plainly admitted that he knew exactly what relevance all this evidence had, so his failure to consider it is, at this point, inexplicable by  any means other than pure malice.

(e)      Appellant introduced evidence that the jail had an inconsistent policy of claiming food trays. Whenever Appellant had his food tray stolen, they said it was his fault, but when Appellant was the one taking a food tray whose rightful owner failed to claim it, they reprimanded Appellant. See Appellant's Exhibits E(7)(a) & E(7)(b), and the accompanying testimony at 02:57:10 – 02:58:39. Their only consistency was causing Appellant to lose, proving that they were singling Appellant out for special treatment (most likely because of his lawsuits.

(f)      Appellant introduced a complaint against a jail guard named "Mendez," who punished Appellant with lockdown when Appellant exercised his First Amendment rights. See Appellant's Exhibit E(8). By Jason Day's own admission, he did absolutely nothing to

punish Mendez for this blatant act of First Amendment retaliation. He was told, by the respondent Mendez, that Appellant was being "hateful," but by his own admission, he never addressed the issue of Mendez threatening punishment *because* Appellant exercised his First Amendment right to petition. See Day 1 at 0:59:22 – 1:02:53.

(g)     When Appellant attempted to file a grievance regarding a lost breakfast tray (different incident than on December 14, 2011), Neckels took the grievance, handed it right back to Appellant, and did not even file it. Nickels would do the same thing with the appeal grievance Appellant tried to file in response to that violation, saying that Appellant's grievance filing "ain't doing shit." Only when he could see Appellant writing a letter to his attorney to bring a civil action against the jail, only then did he take the grievances, and only submit ONE of them to Jason Day, while the appeal grievance just disappeared off the face of the earth. See day 1, 04:33:03 – 04:34:40.

(h)     When Appellant filed a grievance against Timothy Porrez, Porrez came storming into Appellant's cell, threatening Appellant at gunpoint and daring Appellant to repeat the contents of the grievance to Porrez' face. See Day 1, 02:32:15 – 02:33:37.

26.     In ALL of the above-mentioned incidents (literally 100% of the time), when Appellant attempted to complain about the incidents, jail administrator Jason Day either cut Appellant off and would not allow Appellant to air his grievance, or allowed Appellant to air his grievance, but subsequently did absolutely nothing in response to it, save for the aforementioned rare instances where he would ask the jail guards if the accusations were true, and when they denied it, he decided that no further investigation was necessary. Perhaps the best written example of this is Exhibit E(5), where Appellant made accusations of a death threat, and Jason Day's written response was "Spoke to Cpl. Avey and she stated this is false." He was not even pretending like

the investigation went any further than that.

27.     Bob King dismissed Appellant's grievance entirely out-of-hand, and lied (as in …

committed an act of perjury) when he testified and said that he interrogated several witnesses

about Jones' conduct. In any event, he freely admitted that he did not view camera footage in

regards to Appellant's accusations against Jones (see Magistrate Judge's Report &

Recommendation) which means that his decision to cite Appellant is automatically without

probable cause, pursuant to the precedent of *Kuehl v. Burtis*, 173 F. 3d 646, 650 (8th Cir. 1999).[3]

28.     Appellant also produced an Interrogatory response from the Appellees, where they admit

that their ONLY method of dispute resolution is moving inmates to different pods, which does

absolutely nothing to resolve issues of jail guards abusing inmates.

29.     Appellant produced leagues of evidence, besides those already listed, of the jail's custom

of constantly ignoring inmate complaints against jail guards, and allowing jail guards to harass

and bully inmates without consequences, without regard to what their official written policies

say. However, because Appellant is limited to 14,000 words in his brief, he cannot list them all.

Appellant asks this Court to review the audio recordings Appellant has provided, review

Appellant's "Objection to Report & Recommendation," and listen to all the evidence.

30.     As for the issue of failing to provide reasonable accommodations for Appellant's

Asperger Syndrome, Appellant introduced the following testimony and evidence:

    (a)     Appellant notified the jail of his Asperger Syndrome the first day Appellant was

    booked into the jail. See Appellant's Exhibit G.

    (b)     The jail officers themselves did absolutely nothing to accommodate the disability. The

    closest they came to accommodating Appellant's lack of social skills was moving Appellant

---

3   "An officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial
    inculpatory evidence (standing by itself) suggests that probable cause exists."

around the jail to remove him from threatening inmates. They did absolutely nothing to accommodate the issue of jail *guards* being offended at Appellant's lack of social skills, and *punishing* Appellant for this *accidental* rudeness. See Appellant's Exhibit H.

31.    On the issue of whether Appellant was arrested (and, subsequently, charged) for the sole purpose of persecuting Appellant for his litigation history (in other words, both a violation of 42 USC § 1983 *and* a violation of 42 USC § 12203), Appellant showed, among other things, the following evidence:

(a)    Appellant produced testimony that the arresting agency – Jason Beathky – arrested Appellant almost immediately upon hearing the alleged victim's accusations. Then, after arresting Appellant, then, and only then, did he enter the house in search of evidence to support his pre-existing decision. See Day 2 at 1:56:02 – 1:57:18.

(b)    Appellant also testified that Jason Beathky completely ignored – as in, he did not dismiss the argument as meritless, but rather, pretended that there was no argument raised in the first place – Appellant's offer for plainly exculpatory evidence which, under the precedent of Kheul v. Burtis, supra, the police are not at liberty to ignore, even if significant incriminatory evidence, standing by itself, suggests that probable cause exists. See Day 2 at 1:57:18 – 1:57:28.

(c)    Appellant produced a copy of a plea offer from prosecuting attorney Wes Bradford (which was relevant and admissible under Federal Rule of Evidence 408(b)) that contained two conditions of probation: "(4) The Defendant must dismiss any/all pending Pro Se lawsuits; (5) The Defendant shall not file any Pro Se lawsuits while on probation." Appellant produced this exhibit pursuant to Federal Rule of Evidence 408(b) to show evidence of bad faith in the prosecuting attorney, Wes Bradford, choosing to pursue these charges against

Appellant.[4]

32.　　After a lunch recess, Appellant underwent his cross-examination, during which the following evidence was revealed:

(a)　　Despite the Defendants' beliefs, Appellant did not plead guilty to his criminal charges. Rather, he entered a plea of *nolo contendre* (see Day 1 at 3:39:14 - 3:40:51), a plea which is not admissible outside the case in which it is entered; see Federal Rule of Evidence #410.

(b)　　There were actually TWO occasions when the jail had actually failed to even file Appellant's grievances, instead throwing them away so that there would be no paper trial to show that they went unaddressed.  See Day 1 at 4:33:02 – 4:35:25.

33.　　Former Boone County jail inmate, Morris Davis, took the stand and testified thusly:

(a)　　On December 14, 2011, Jason Jones could be heard screaming at the top of his lungs in the neighboring B-Pod (Davis himself was placed in C-Pod) screaming "Stebbins, you cocksucker! I'll beat you so bad you won't be able to crawl out of here!"

(b)　　He had never – literally once, in his entire three-year tenure there – seen even a single instance where a jail guard was investigated, let alone disciplined, for any abuse of inmates. In fact, he testified that Jason Day himself would often join in the fun by harassing and bullying various inmates, himself.

(c)　　Davis testifies that he saw numerous instances of inmates – including himself – be harassed, bullied, and threatened by numerous jail guards, including Jason Day himself!

---

4　Bear in mind that, although Rule 408(b) does not *expressly* list this purpose, like the corresponding Arkansas Rule, it does not have to. The Rule permits the evidence's admission for any purpose, whatsoever, other than those listed Rule 408(a). Those listed in Rule 408(a) are 1) proving Appellant's innocence of the domestic battery charge, and 2) impeaching a witness by showing an inconsistency.

Purpose #2 is not applicable in the first place, here, and Appellant was not introducing the plea offer for purposes of proving himself innocent of the knife attack; he was introducing it for the purpose of showing that the authorities in Boone County *didn't care* about Appellant's guilt or innocent of the knife attack, but rather, saw it as a means to an end.

Some examples he gave are listed below:

i.        Some jail guards threw out Davis' own $2,800 pair of dentures, and the jail administration did absolutely NOTHING to rectify the problem. See Day 1, 05:01:01 – 05:04:40.

ii.        Jason Day himself – not just a jail guard, but THE top jail guard – once caught Davis with a stiff pen, and threatened to show "show him what it was made for," effectively threatening Davis with it. See Day 1, 04:59:13 – 05:00:47.

iii.        His own sets of glasses were embezzled from his personal property, simply because the jail staff wanted them. See Day 1, 05:01:25 – 05:02:20.

iv.        Jail guards would repeatedly use tazers and pepper spray to inflict serious physical suffering on inmates, just for fun! He says that Silva would taze someone just for joking about Silva's body weight, and then stand there and laugh. See Day 1, 05:04:41 – 05:05:34.

v.        In one of his affidavits, he testifies that he once bore direct witness to an inmate named Mike was denied his antidepressant medications (leading to two suicide attempts), and was physically assaulted because he complained about a rupture in his stomach lining. See Appellant's Exhibit E(1), ¶¶ 7-8.

(d)        During cross examination, Davis testified that he was arrested once before. His crime, apparently, was that he did not stand still and allow his wife to shoot him. See Day 1, 05:16:39 – 05:17:10.

34.        Bob King then took the stand, where he freely admitted to the following things:

(a)        When citing Appellant for disorderly conduct, he admitted that he viewed security camera footage to investigate an inmate's allegations of the physically impossible (that a mop

bucket increased in energy after bouncing, rather than decreasing), but he did NOT view camera footage to confirm Appellant's accusation that Jones had threatened Appellant's life. His excuse for not viewing this footage, officially, was there was no audio. However, he admitted that the footage, even without audio, would still have shown Jones' body language, including him flailing his arms, shoving Appellant with his chest, and doing various other threatening gestures.

(b)    He stated that he did not view the camera footage of Jones' conduct because he already determined the matter to be without merit. He claimed that he interrogated witnesses, but he offered no evidence, whatsoever, of these interrogations. In other words, he expected the Court to trust him entirely on his word. Of course, he never interrogated anybody about Jones; it was all a lie and he should be charged with perjury for it.

35.    Jason Beathky then took the stand and testified thusly:

(a)    Beathke freely admitted that he did not factor Appellant's entitlement to the Internet connection – which had been violated – into his arrest decision. See Day 1, 05:57:11 – 05:57:15. This constitutes an act of "ignoring potentially exculpatory evidence."

(b)    Beathke also admits that he did not confiscate the pillow that was allegedly used as a shield by the alleged victim, even though he clearly considered it to be "relevant evidence" by nature of the fact that he photographed it. See Day 1, 06:11:29 – 06:13:48. This prevented Appellant from being able to examine the evidence himself in the hopes of finding some rebuttal evidence (such as... fingerprints or the pattern the blood splattered on). This constitutes a severe due process violation under *White v. McKinley*, 519 F. 3d 806, 813 (8th Cir. 2008) (holding that cover-up of potentially-exculpatory diary constituted evidence upon which a jury could infer a conspiracy).

36.     Tina Avey then took the stand, where she testified that A) Appellant has the right to file grievances, and B) this right does not go away simply because she believes that the grievances are stupid. See Day 1 at 06:59:34 – 06:59:47.

37.     On the beginning of the second day, Brandon Starnes took the stand and testified that Tina Avey punished Appellant with Lockdown, not for breaking any rules, but simply for filing grieves she believed to be stupid. Put Avey's and Starnes' testimonies together, and that Avey punished appellant, fully in the knowledge that this punishment was unconstitutional.

38.     When Appellant re-called himself to offer rebuttal testimony against Jason Beathky, the Defense Counsel attempted to introduce a surprise exhibit.  Appellant objected on the grounds that this exhibit was introduced in complete disregard to Appellant's discovery rights, but the magistrate judge ignored Appellant's right to discovery, instead allowing Appellant only a few seconds to review the document.

39.     Despite the discovery violation Appellant instantly recognized that the document was necessarily a forgery.  He attempted to explain to the magistrate judge that the real sentencing order should call for a deferral of adjudication, but the magistrate judge acknowledged that the sentencing order offered by the Defense called for a finding of guilt.

40.     As the hearing drew to a close, Appellant began his closing arguments, where he argued thusly:

(a)     The judge was reminded that he must believe Appellant's evidence and avoid credibility determinations.

(b)     Appellant has introduced plenty of evidence of the county's unconstitutional custom of allowing jail guards to abuse inmates.

(c)     Appellant has introduced the testimony of a disinterested witness – Morris Davis – to

corroborate Appellant's claims; the defense does not have any disinterested witnesses.

(d)    Appellant has produced enough evidence upon which a jury could conclude that a conspiracy was hatched to have Appellant arrested to persecute him for his crimes, according to the precedent of White v. McKinley, 519 F. 3d 806, 816 (8th Cir. 2008).

(e)    Appellant should be given summary judgment for $370 to compensate Appellant for the unconstitutional disorderly conduct citation.

41.    As the evidence hearing came to a close, Appellant made every effort he could to prove that the Defendants' sentencing order showing Appellant to be convicted was a forgery.  He produced his own certified copy of the sentencing order (a copy which, rather than saying "There being no legal cause shown by the Defendant, as requested, why judgment should not be pronounced, a judgment is hereby entered against the Defendant on each charge enumerated," instead said "Pursuant to A.C.A. §§ 16-93-301 et seq., this Court, without making a finding of guilt or entering a judgment of guilt and with the consentn of the Defendant defers further proceedings and places the Defendant on probation."  See Exhibit A to Appellants First Response to Show Cause Order, and Exhibit A to his Second Response to Show Cause Order (Doc. 160).

42.    In addition to that sentencing order, Appellant attached a copy of an Order to Seal. This order, signed by Gordon Webb, stated that Appellant's record was to be sealed according to A.C.A. § 16-93-301 (As used in this subchapter, "sealing" means the procedure and effect as defined in the Comprehensive Criminal Record Sealing Act of 2013, A.C.A. § 16-90-1401 et seq.).  This act incorporates, by reference, the effect of sealing set forth in the CCRSA of 2013, which states, in pertinent part, the following:

> "Upon the entry of the uniform order, the person's underlying conduct shall be deemed as a matter of law never to have occurred, and the person may state that the underlying conduct did not occur and that a record of the person that was sealed does not exist." See Ark Code Ann § 16-90-1417(b)(1).

43.     In order words, Appellant was A) never convicted in the first place, and B) completely exonerated of any offense, even if a conviction was temporarily on the record (which it was not).

44.     On or around July 12, 2014, Magistrate Judge James R. Marchewski entered a Report & Recommendation, where he conveniently IGNORED 99% of the evidence that was presented at the evidence hearing.  Specifically, he pretended like Appellant had not introduced any evidence that Boone County had any unconstitutional policy or custom.

45.     This was a complete lie. Appellant has already demonstrated that he, and numerous witnesses, introduced plenty of evidence to that effect.  Appellant has, just in this Statement of the Case alone, covered nearly two dozen pieces of evidence that were presented of unconstitutional policy & custom.

46.     So, on July 24, 2014, Appellant submitted a 39-page objection to this Report & Recommendation. This objection made perfectly clear Appellant's accusation that the magistrate judge was simply *lying* so he could have an excuse to recommend dismissal.  He outlined plenty of evidence of unconstitutional policy and custom, and therefore, the Magistrate Judge's Report & Recommendation should be thrown out.

47.     On March 30, 2015, District Judge Brooks entered a judgment dismissing the case with prejudice.  In his judgment, he made the following findings:

   (a)     Appellant had not shown any evidence of an official or unofficial policy or custom of arresting people without probable cause.

   (b)     Appellant offered nothing more than his speculation as to the "real" reason he was arrested.

   (c)     Appellant was convicted of his offense, and his conviction was never set aside.

   (d)     Appellant has not plead, in his Complaint, sufficient facts upon which a jury could

find that there was any official or unofficial policy or custom of jail guards abusing inmates.

(e)     It is disputed whether Asperger Syndrome should even be considered a disability.

(f)     Appellant requested the reasonable accommodation of being allowed to break rules.

(g)     The fact that the alleged victim was injured automatically creates probable cause, even if the arresting officer knew the injuries were self-inflicted.

48.     He never issued any order on Appellant's Objection to the Magistrate Judge's Order Denying Motion for Rule 37(d) sanctions.

49.     Appellant filed a Motion for Reconsideration, attempting to point out the District Judge's errors, for the reasons already stated in this Statement of the Case.  The district judge denied the motion for no reason.  Well, technically, there was a reason; he said that he was not convinced he had made any mistake.  However, he never gave any explanation as to how or why Appellant's arguments were unpersuasive.

50.     This timely appeal ensued.

## SUMMARY OF ARGUMENT

1.      According to the undisputed facts, the arrest was made without probable cause.

2.      Appellant was unfairly deprived of his right to discovery. Any alleged inability to prove the necessary elements should be forgiven for this reason.

3.      Appellant's claim for First Amendment censorship was improperly summarily dismissed for want of evidence. The District Judge asserted a particular fact, decided that his belief in that fact was all the evidence he needed to support a summary judgment, and dismissed that claim entirely on a whim.

4.      Appellant's claim for 13th Amendment involuntary servitude was improperly summarily dismissed for want of evidence. Unlike with the claim for First Amendment censorship, this time, the District Judge gave no explanation whatsoever, instead simply saying that Appellant's claims were "entirely without merit" for no other reason than … he disagreed with them.

5.      Appellant's claim for preventing Appellant from posting bail was improvidently dismissed for want of evidence. He made a ruling on the weight of evidence when he said "Judging from the record, it does not appear that the Appellees were even negligent."

6.      The Magistrate Judge's Report & Recommendation was against the clear wait of evidence. He lied, and he *knew* he was lying, because he had already admitted, during the evidence hearing, that Appellant was presenting precisely the type of evidence he said was lacking in his R&R.

7.      District Judge Brooks had no authority to dismiss the case due to an insufficiently-drafted complaint, as that issue had long since been resolved before he was even appointed to the bench.

8.      District Judge Brooks' finding of fact that Appellant had not alleged sufficient facts, in his complaint, to support a finding of unconstitutional policy or custom was against the clear wait of evidence, for the same reasons as the Magistrate Judge's R&R.

**ARGUMENT**

1.      If you have not already seen the reversible errors committed by the District Court, just on the "Statement of the Case" alone, you are either incompetent to serve on the 8th Circuit bench, or just as corrupt as they are.  But, because the "argument" section is required by Fed.R.App.P. 28(a)(8), Appellant will state what should not need to be stated.

**Sub-Section 1: The undisputed facts show that the arrest was without probable cause, and is part of municipal policy.**

2.       Appellant believes that this needs to be addressed first, as it has the potential to dispose of every other issue brought forth in this appeal. If the arresting agency did not have probable cause to arrest Appellant, then that means that *everything* that happened while incarcerated is automatically unconstitutional, even if those same actions would not be unconstitutional if Appellant was there lawfully.

3.      District Judge Brooks is of the opinion that, as long as a person is injured at the crime scene, that is all the evidence an officer needs in order to have probable cause to make an arrest. Even if the arrest was planned, weeks or months in advance, that doesn't matter; "injuries" means "automatic probable cause," and that's all there is to it.

4.      Binding precedent from the 8th Circuit, however, says the exact opposite.  See *Kuehl v. Burtis*, 173 F. 3d 646, 650 (8th Cir. 1999):

> "Probable cause exists when the totality of circumstances demonstrates that a prudent person would believe that the arrestee has committed or was committing a crime … [B]ecause the totality of circumstances determines the existence of probable cause, evidence that tends to negate the possibility that a suspect has committed a crime is relevant to whether the officer has probable cause. An officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists. An officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists. " id at 650 (Internal citations omitted)

5.      Therefore, the district judge clearly abused his discretion in denying Plaintiff's Motion for Reconsideration, and committed reversible error when he dismissed the matter with prejudice.

6.      It is undisputed (because it was admitted by Danny Hickman; see ¶ 23 of the "Statement of the Case" in this brief, and the corresponding references to the record) that the Boone County Sheriff's Department has an official policy of giving deputies discretion in three key areas: (A) Arresting a person BEFORE viewing all evidence in their immediate range, (B) listen to each side of the story before arresting someone, and (C) confiscating relevant evidence.

7.      These policies are unconstitutional. The first two are unconstitutional policies under the precedent of *Kuehl v. Burtis*, supra:

> ("law enforcement officers have a duty to conduct a reasonably thorough investigation prior to arresting a suspect, at least in the absence of exigent circumstances and so long as 'law enforcement would not [be] unduly hampered ... if the agents ... wait[] to obtain more facts before seeking to arrest.' An officer need not conduct a 'mini-trial' before making an arrest, but probable cause does not exist when a 'minimal further investigation' would have exonerated the suspect." *id* at 650 (internal citations omitted).

8.      Meanwhile, the third policy – discretion in confiscating evidence – is unconstitutional under the precedent of *Brady v. Maryland*, 373 US 83 (1963), which requires that all relevant evidence be fully disclosed to the Defense.  If it is exonerating evidence, it must be disclosed to the Defense, otherwise incur a Brady violation; if it is incriminating evidence, it must be fully disclosed to the Defense as per the Defense's right to discovery.

9.      Thus, if any one of those three rights were violated during Appellant's arrest period, then the entire arrest – and, by proxy, Appellant's entire period of incarceration that stemmed from said arrest – is unconstitutional.  Because Hickman admitted that it was County Policy to allow deputies such unconstitutional levels of discretion, the County should be liable for the arrest and incarceration.

10.     We know, for absolute certain, that at least two of those three rights were violated during Appellant's arrest.  Specifically, he admitted that he did not hear Appellant's entire side of the story (See ¶ 34(a) and the corresponding reference to the record), and he did not confiscate relevant evidence (see ¶ 34(b) and the corresponding reference to the record).

11.     So, both the constitutional violations, and the policy of same, have both been admitted to by Defense witnesses.  Without any further evidence, Appellant has demonstrated a legal entitlement to recover damages for his arrest and all injuries suffered as a direct or indirect result of the arrest (including all injuries suffered during incarceration).

12.     In addition to this, Plaintiff introduced plenty of evidence that the arrest was without probable cause:

    (a)     Testimony evidence that the cop arrested Plaintiff and THEN entered the house in search of evidence to support the arrest, in violation of the precedent of *Kheul v. Burtis*.

    (b)     Testimony that the Defendant ignored potentially exculpatory evidence.

13.     Plaintiff also introduced evidence that it is the County's custom to arrest people without regard to probable cause. Specifically, he introduced the testimony of disinterested witness Morris Davis that he was once arrested, not for committing a crime, but for *reporting* one. See ¶ 33(d).

14.     To defeat this, the Defense attempted to introduced fabricated evidence that Appellant was convicted of his charges, thus barring any relief under the precedent of *Heck v. Humphrey*, 512 U.S. 477 (1994).

15.     The District Judge ate this up with a spoon, saying that Appellant A) was convicted, and B) this conviction was NOT set aside.

16.     Both of those, however, are bald-faced lies.  Appellant was never convicted. See Exhibit

A to Doc. 160 in the District Court. The District Judge apparently decided that the Defendant's evidence was more probative than Appellant's evidence, but that is not allowed on a motion for summary judgment, or evidence hearing.

17.     Indeed, there is *affirmative evidence* that the Defendant's copy of the sentencing order was a forgery:

    (a)     Recall that it was after the lunch recess when the Defense learned that Appellant had not pleaded guilty to his charges, like they initially thought. See ¶ 32(a). Thus, it was only at that point they felt the need to acquire a copy of the sentencing order in order to prove their point.

    (b)     However, court did not adjourn on the first day of the evidence hearing, until 5:28PM. See Doc. 152. By then, the Boone County Circuit Court had closed, so no certified court records could be obtained.

    (c)     The next day, Court convened at 8:05AM. See Doc. 153. Although that would appear, at first glance, to give the Defense a five-minute period where they could obtain such a record, listening to the audio recording says otherwise. The Magistrate Judge forgot his hearing aids and needed to take some time to put them in. Thus, Court actually began at 8:00AM, like it was supposed to.

    (d)     Thus, the sentencing order HAS to have been a forgery, because the Defense never had an opportunity to obtain an authentic copy.

18.     So, Appellant was NOT convicted of his charges. But even if he were, that conviction was set aside. See Doc. 160, as well as Exhibits B, C, and D to that filing (Exhibits C and D demonstrate that "sealing" means that the defendant is completely exonerated, and the underlying conduct is deemed as a matter of law never to have occurred). The district judge's

finding that Plaintiff's conviction was not set aside is nothing short of a bald-faced lie.

19.     For these reasons, the decision of the district court should be reversed.

**Sub-Section 2: Appellant was unfairly deprived of his right to discovery.**

20.     Plaintiff filed a motion to compel discovery, asking the Defendants to produce evidence Plaintiff knew did not exist. The admission that this evidence did not exist would have, if admitted, been irrefutable proof that the jail has a custom of ignoring, and never investigating, complaints against guards.

21.     The Motion to Compel Discovery was granted, but the defendants raised an entirely new objection. When Plaintiff moved for Rule 37(d) sanctions, arguing that their new objection was untimely, the magistrate judge completely ignored the untimely argument, and instead proceeded to consider the merits of the objection. He determined that the objection was valid.

22.     Appellant filed an objection to the magistrate judge's order, pursuant to his rights under Fed.R.Civ.P. 72(a), but it was never ruled on. The objection is presumed overruled.

23.     Overruling this objection means affirming a clear abuse of discretion. "When we say that a decision is discretionary, or that a district court has discretion to grant or deny a motion, we do not mean that the district court may do whatever pleases it. The phrase means instead that the court has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law. An abuse of discretion, on the other hand, can occur in three principal ways: when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment." See *Kern v. TXO Production Corp.*, 738 F. 2d 968, 970 (8th Cir. 1984). See also *United States v. Kramer*, 827 F. 2d

1174, 1179 (8th Cir. 1987).

24.     Because the Magistrate Judge clearly failed to consider the issues discussed in Paragraphs #3 and #6 of the Objection, this falls squarely within the criteria of the first "principal way" that a judge may abuse his discretion.

25.     The Magistrate Judge suggested that Plaintiff may question the witnesses about whether or not the grievance policy was followed.  Plaintiff was already planning on doing that in the first place, but the Magistrate Judge is missing the point.

26.     Why should we *trust* the jail guards to tell the truth? Of course they're going to *claim* that they take complaints seriously. Plaintiff had made good faith attempts to secure *evidence* to prove his claims, but the jail – who had an interest in keeping the court not pivy to that evidence – covered it up. They should be forced to disclose the requested evidence, just on that grounds alone.

**Sub-Section 3: Appellant's claim for First Amendment censorship was improperly summarily dismissed for want of evidence.**

27.     The Defendants had a rule in the jail that inmates had to treat jail guards with respect and courtesy, without requiring guards to reciprocate that respect.

28.     Plaintiff filed a motion for Partial Summary Judgment, claiming that A) it was undisputed that the jail had this policy and B) this policy, to the extent it applied to pre-trial detainees, was unconstitutional, since it could not serve a legitimate penological interest (pursuant to the precedent of *Bell v. Wolfish*, 441 US 520 (1979)) and it did not pass strict scrutiny because it was not related to any legitimate interest of the jail. Rather, it seemed to be directed towards stoking the jail guards' narcissistic egos.

29.     Not content with the motion simply having that motion denied, the Defendants filed their own motion for partial summary judgment, claiming that it helped to "maintain security" in the

jail. However, although they alleged a sufficient "compelling governmental interest," which is the first step of strict scrutiny, they made no attempt, whatsoever, show any evidence that their policy actually served that purpose.

30.     To pass strict scrutiny, merely alleging a compelling governmental interest is not enough to be allowed to curb a fundamental right. It must also be the narrowly tailored to that interest. See *Adarand Constructors, Inc. v. Pena*, 515 US 200, 227 (1995) (when a law "must be analyzed by a reviewing court under strict scrutiny … such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests").

31.     Because Appellant was not convicted, he still has the first amendment right to free speech. See *Bell v. Wolfish*, 441 US 520 (1979) ("Government concededly may detain him to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution").  The Defendants in this case offered absolutely nothing to show that requiring inmates to show general respect to jail guards – without evidence of further, more concrete defiance – served any interest of the jail, other than the guards' narcissistic egoes.

32.     Despite the complete lack of evidence, P.K. Holmes granted the Defendant's motion for summary judgment. He did not deny it for want of evidence; rather, he did not feel he needed it.

33.     This is a violation of Appellant's due process rights. The relevant facts – whether the speech censorship served any security interest – were inherently disputed in this matter, not because the Defendant's evidence was flawed in some way, but because the evidence was entirely non-existestant.

34.     When strict scrutiny is applied, the Defendants hold the burden of proof. See *Roe v. Wade*, 410 US 113, 156 (1973) ("The District Court held that the appellee failed to meet his

burden of demonstrating that the Texas statute's infringement upon Roe's rights was necessary to support a compelling state interest"). The Defendants have not met that burden, by a long shot.

35.     Thus, the decision of the district court to grant the Defendant's Motion for Partial Summary Judgment should be reversed.

**Sub-Section 4: Appellant's claim for 13th Amendment involuntary servitude was improperly summarily dismissed for want of evidence.**

36.     The Defendants also moved for partial summary judgment on Appellant's claim that forcing him to perform manual labor, before he was convicted, violated his 13th Amendment right to be free from involuntary servitude "except as a punishment for crime whereof the party shall have been duly convicted."

37.     This time, the Court completely usurped the position of "Defense Counsel" and raised an entirely new justification for the policy that was not raised by the Defense. The Defendants themselves claimed that forcing Appellant to do manual labor helped keep the jail clean. When the magistrate judge realized that this would not work, he instead raised, on the Defendants' behalf, that involuntary servitude could, theoretically, serve some sort of theraputic interest.

38.     The magistrate judge offered no evidence that the jail's policy of forced labor either was designed to serve this interest, or that it had any tendency to have that affect. Rather, to support his ruling, the magistrate judge cited a persuasive precedent (not even a binding one) called *McGarry v. Pallito*, 687 F. 3d 505 (2nd Cir. 2012), which stated, in an general, nonspecific comment, that a pre-trial detention center *might* be justified in using forced labor if it served some sort of theraputic interest.  However, even that persuasive precedent declined to entertain that possibility beyond mere hypothetical speculation, precisely because it was not raised by either party. See *id* at 513 ("In Jobson v. Henne, we assumed, ***WITHOUT HOLDING***, that the Thirteenth Amendment does not foreclose states from requiring lawfully committed inmates to

perform certain chores without compensation. We premised this assumption on the understanding that the program in question has a therapeutic purpose" Bolded, underlined, capitalized, and italicized for emphasis). The same precedent then goes on to say "We made clear that 'the Thirteenth Amendment may be violated if a[n] ... institution requires inmates to perform chores which ... are not personally related, but are required to be performed solely in order to assist in the defraying of institutional costs.'" See *id* at 514.

39.     Appellant raised that argument in his objection (and thus, the argument is properly preserved for appeal). However, P.K. Holmes simply stated upheld the magistrate judge's recommendation for absolutely no reason whatsoever. He did not even make arbitrary findings of fact without any evidence to support them, like he did with the free speech issue; this time, he just said that Appellant's arguments were "entirely without merit," even though they clearly were not.

40.     There is an abundance of binding precedent repeatedly stating that failure to give any explanation whatsoever constitutes an automatic abuse of discretion, even if the district court might have had good reasons for issuing that ruling:

(a)     *US v. Burrell*, 622 F. 3d 961, 964 (8th Cir. 2010) (citing Kern v. TXO, which was cited by Plaintiff in his objection to the Report & Recommendation):

> "We have held that a district court need not give lengthy explanations … but this does not permit a district court to give no explanation for its decision.
> …
> It is impossible for us to ensure that the district court did not abuse its discretion if the [§ 3582] order shows only that the district court exercised its discretion rather than showing how it exercised that discretion.
> … [A] district court must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing
> …
> In this case, we vacate and remand because the record does not allow us to discern how the district court exercised its discretion. The court did not identify any factors that it considered relevant in deciding to reduce Burrell's sentence and

determining the extent of that reduction."

(b) *Rayes v. Johnson*, 969 F. 2d 700, 704-713 (8th Cir. 1992) ("The district court may have had reason to deny Rayes' request for subsequent counsel, but no explanation appears in the record. The request was summarily denied twice")

(c) *Slaughter v. City of Maplewood*, 731 F. 2d 587, 589 (8th Cir. 1984) ("Second, although we have jurisdiction to review the district court's denial of counsel, we nevertheless find it necessary to remand because we cannot determine from the record whether the district court exercised a reasoned and well-informed discretion, so as to permit our review for abuse of discretion")

(d) *Foman v. Davis*, 371 US 178, 182 (1962) ("[O]utright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules").

(e) *Gulf Oil Co. v. Bernard*, 452 US 89, 103 (1981) ("We conclude that the imposition of the order was an abuse of discretion. The record reveals no grounds on which the District Court could have determined that it was necessary or appropriate to impose this order").

(f) *US v. Walters*, 643 F. 3d 1077, 1080 (8th Cir. 2011) ("Accordingly, given the lack of specific findings and the evidence in the record, we find that the district court abused its discretion in imposing special condition two and, thus, vacate that condition").

(g) *Jarrett v. ERC Properties, Inc.*, 211 F. 3d 1078, 1084 (8th Cir. 2000) ("The district court's good faith finding was stated in conclusory fashion with no explanation ... Therefore, the court abused its discretion in refusing to award Jarrett $11,970.08 in liquidated damages").

(h) *Thongvanh v. Thalacker*, 17 F. 3d 256, 260 (8th Cir. 1994) ("A careful review of the

record reveals no explanation whatsoever for the reduction. Accordingly, the jury award of $4,000 is restored.")

(i)    *Purcell v. Gonzalez*, 549 US 1, 8 (2006) ("There has been no explanation given by the Court of Appeals showing the ruling and findings of the District Court to be incorrect. In view of ... our conclusion regarding the Court of Appeals' issuance of the order we vacate the order of the Court of Appeals")

(j)    *Press-Enterprise Co. v. Superior Court of Cal., Riverside Cty.*, 464 US 501, 513 (1984) ("Thus not only was there a failure to articulate findings with the requisite specificity but there was also a failure to consider alternatives to closure and to total suppression of the transcript. The trial judge should seal only such parts of the transcript as necessary to preserve the anonymity of the individuals sought to be protected.")

(k)    *United States v. Grinnell Corp.*, 384 US 563, 579 (1966) ("The District Court gave no explanation for its refusal to grant this relief. It is so important and customary a provision that the District Court should reconsider it")

(l)    *Delaware v. Van Arsdall*, 475 US 673, 680 (1986) ("In so doing, it offered no explanation why the Chapman harmless-error standard, which we have applied in other Confrontation Clause cases, is inapplicable here. We find respondent's efforts to defend the automatic reversal rule unconvincing")

41.    The decision of the District Court should be reversed, as it was improvidently issued, was against the clear weight of evidence, and had no evidence to support it.

### Sub-Section 5: Appellant's claim for preventing Appellant from posting bail was improvidently dismissed for want of evidence.

42.    Appellant also filed a motion for partial summary judgment because the jail did not allow Appellant to post bail when he had the opportunity to do so, delaying his release by several

weeks, so they could harass him some more.

43.    P.K. Holmes also dismissed that claim. This time, he had *some* evidence to support the dismissal. However, the evidence was far from undisputed.

44.    The Defendant's evidence was, essentially, the uncorroborated word of the interested jail guards. Holmes' exact words, when dismissing this claim, were "Judging from the evidence, it does not appear that the Defendants were even negligent." In other words, he decided to analyze the weight of evidence on a motion for summary judgment. Furthermore, he was making the determination that the jail guards, despite their interest in the outcome of the case, were "credible" witnesses.

45.    He can't do that. Both of those determinations – weighing the evidence and making credibility determinations – have long been disallowed during summary judgment proceedings. See *US ex rel. Miller v. Weston Educational, Inc.*, 784 F. 3d 1198, 1206 (8th Cir. 2015) ("at summary judgment this court examines whether there is a genuine issue of material fact; it does not weigh the evidence or decide credibility"); see also *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) ("This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial'").

46.    Under the existing evidence, a reasonable jury could very easily find that the jail guards had acted with a malicious intent to keep Appellant incarcerated longer. Specifically, there is evidence of innumerable acts committed by the jail guards that are completely inexplicable on any grounds other than either pure malice or a lazy desire to not do one's job. Most of these acts were covered in the Magistrate Judge's Report & Recommendation in the summer of 2014:

    (a)    Jason Jones consistently harassed, bullied, badgered, and even threatened Appellant's

life.

(b)     Tina Avey would threaten to slit Appellant's throat if he even "thinks" about disrespecting her.

(c)     Appellant was threatened with a gun by a jail guard who Appellant filed a grievance against.

47.     Holmes also stated, when dismissing Appellant's claim, that even if Appellant could show evidence of malice and intent, there was still no evidence of an unconstitutional policy or custom.  However, there *is* evidence of that. Specifically, Appellant introduced a legion of evidence to show that the jail's administration has a custom of always ignoring complaints filed against jail guards. This means that, even if they have an official policy of allowing inmates to post bail, it does not matter; the county should be liable anyway, because they never truly hold their officers to the official policies.

48.     The evidence Appellant has to support this unofficial custom will be discussed in the next sub-section:

### Sub-Section 6: The Magistrate Judge's Report & Recommendation was against the clear wait of evidence.

49.     This is where you can tell the court just stopped caring about maintaining an illusion of impartiality. The Court's actions, from this point on, are just as clearly malicious as Jason Jones' conduct.

50.     A two day evidence hearing was held on April 22-23, 2014. According to the magistrate judge, the purpose of that evidence hearing was not to try the facts, but to determine if there were any facts to be tried. The magistrate judge stated, on numerous occasions prior to the evidence hearing, that he must "avoid credibility determinations, believe the Plaintiff's evidence, and resolve all factual disputes in the Plaintiff's favor."

51.     As stated in the "Statement of Facts" in this case, Appellant introduced a legion of evidence that showed that, irrespective of any official, written policies, the jail had an unofficial custom of always ignoring complaints filed against jail guards, 100% of the time. This means that anything an officer does – even if it is against written policy – is automatically part of an unconstitutional municipal *custom*, because even if it is technically illegal, the jail administration will nevertheless allow it, thus creating municipal liability via "tacit authorization."

52.     Appellant is already bordering on his 14,000 word limit as-is, and so to avoid going over, Appellant asks the Court to refer to the "Statement of the Case" to remind itself what evidence was presented.

53.     The Magistrate Judge entered his Report & Recommendation, suggesting that the case be dismissed on the grounds that Appellant had not introduced any evidence of any unconstitutional policy or custom.

54.     This is nothing short of a bald faced lie. To reach this conclusion, the Magistrate Judge had to entirely ignore about half of the evidence presented by Appellant at the evidence hearing. By "entirely ignore," Appellant does not mean that he found the evidence to be unpersuasive without giving a reason why. Instead, the magistrate judge pretended like the evidence entirely did not exist.

55.     The "Statement of Facts" section of this Brief goes into more detail as to how the magistrate judge's statement was a lie.

56.     Because of the abundance of evidence Appellant introduced, municipal liability should be created in *three* (3) different ways:

57.     First, via repeated tacit authorization. See *Johnson v. Douglas County Medical Dept.*, 725 F. 3d 825, 828 (8th Cir. 2013):

"The County's official written policy is to provide comprehensive healthcare services to the inmates. Johnson concedes the "lack of an official, written policy promulgated by the County which would have been the cause of the constitutional deprivation alleged by Mr. Johnson." He contends instead that there is at least a genuine issue of fact as to whether the County has a custom of ignoring that written policy in allowing its jail personnel to deny medication to inmates. To establish a claim for 'custom' liability, Johnson must demonstrate: 1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; 2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and 3) That plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation."

58.     In the *Johnson* case, municipal liability was denied to the plaintiff, but only on the grounds that the three violations occurred over the course of a single night:

"To be sure, multiple incidents involving a single plaintiff could establish a "custom" if some evidence indicates that the incidents occurred over a course of time sufficiently long to permit notice of, and then deliberate indifference to or tacit authorization of, the conduct by policymaking officials. In the instant case, however, Johnson presents no evidence to suggest that the County's policymaking officials would have received notice of the denial of his medication in the early morning hours of January 28 and made a deliberate choice to ignore or tacitly authorize the denial, all in the course of those few hours."

59.     In the instant case, Appellant introduced a mountain of evidence to show exactly what Johnson was lacking. Appellant showed plenty of evidence that the jail administrator, Jason day, repeatedly and consistently ignored Appellant's attempts to grieve about other guards' conduct, cut Appellant off and wouldn't let him get a word in edge-wise, and Appellant even produced disinterested testimony that Day would often partake in the abuse of inmates himself.

60.     Appellant produced disinterested testimony of an inmate who was there for four years, who testified, in no uncertain terms, that he had never once seen a single jail guard be punished for any act of abuse, and there were numerous acts which he saw that deserved punishment, not the least of which was a guard tazing an inmate for fun, and then laughing.

61.     There is more than enough evidence of unconstitutional custom from Boone County, and

the Magistrate Judge's recommendation to the contrary is, to say the very least, against the clear weight of evidence, and he knew that from the beginning.

62.     The District Court's decision should be overturned.

### Sub-Section 7: District Judge Brooks had no authority to dismiss the case due to an insufficiently-drafted complaint

63.     When District Judge Timothy Brooks realized that the Magistrate Judge's report & recommendation was based entirely on bald-faced lies, he decided to dismiss the case entirely on something he had no authority to do.

64.     He claimed that the complaint – not the evidence hearing, but the COMPLAINT – was insufficiently plead, because he believes that Appellant did not plead enough facts in his complaint to show an unconstitutional policy or custom, even if Appellant eventually managed to show an abundance of evidence to that effect.

65.     He also claimed that Appellant was convicted of is charge. However, that has already been addressed in ¶¶ 14-18 of the "Argument" section of this Brief, and thus does not need to repeat them here.

66.     Simply put, Brooks had no authority to make this determination.

67.     Appellant already had his complaint screened for failure to state a claim upon which relief can be granted, pursuant to 28 USC § 1915(e).

68.     Brooks' decision amounts to nothing more than a blatant usurpation. He is sitting in review of the previous judge's judgment, and more importantly, reviewing it *sua sponte* rather than for abuse of discretion.

69.     Even if the original judge had committed clear error in his ruling, it is not a replacement district judge's place to second guess that ruling.

70.     His decision should be overturned, just on that reason alone.  But even if he had some

degree of authority to overrule the previous court's ruling; only an Appellate court can do that.

71. Just on this alone, the District Judge's order should be reversed for lack of jurisdiction.

### Sub-Section 8: The Complaint plead sufficient facts, and therefore, was improperly dismissed, with or without proper authority.

72. Even assuming, playing devil's advocate for a minute, that Brooks had the jurisdiction to dismiss the complaint, his grounds for doing so were still against the clear weight of evidence.

73. He stated that Appellant did not plead enough facts in the complaint that, if proven, would create a presumption of unconstitutional custom. This is a blatant lie. Appellant plead plenty of facts in his handwritten complaint. Here are just a few of them:

> When I filed a grievance form against Jones, Jason Day - the Jail Administrator - stormed into my cell; screaming bloody murder saying I need to "stop with the bullshit" and saying such things as "ain't nobody pickin' on you! Ain't nobody violating your rights!" He would not let me get a word in edge-wise. He then moved me to a new cell that was also in "population," but kept me separate from the inmates who attempted to brutalize me, and returned my grievance form to me. In the space provided for him to provide a written response, he said I was unable to give any specific incidents of what Jones did. Oh, I was able to give some specific incidents: look at this complaint! He just wouldn't let me!
> This example is therefore second generation retaliation.

faith, assuming some shred of possibility still remained.
The two counts of discrimination here are:
1) the failure to prosecute Jones, ~~the the lawsuit I filed~~ and 2) attempting
to charge me, instead. None of these would have
happened had I not sued Jones for discrimination.

---

I filed a grievance against Jones for that.
To this day, I have not received a response
to it.

74.     From these allegations, a reasonable jury could very easily infer that the jail has a custom

of intentionally turning a blind eye to misconduct by jail guards.

75.     As a result, the District Judge's finding that Appellant had not plead sufficient facts to

support a finding if unconstitutional custom is just as much of a blatant lie as the magistrate

judge's finding that Appellant did not show any such evidence at the evidence hearing.

76.     Even if the District Court had authority to reverse the previous judge's order granting *in

forma pauperis* and allowing Appellant to proceed with the case, his decision is still against the

clear weight of the evidence.

77.     Therefore, the District Court's ruling should be overturned.

**CONCLUSION**

In conclusion, the District Court has made its personal spite towards Appellant apparent from Day 1, but this is the part where they abandon all pretense of impartiality.  They are clearly lying, clearing just making stuff up, and clearly basing their rulings entirely on the fact that they do not want Appellant to win.

The decision of the district court should be overturned.

Wherefore, premises considered, Appellant prays that the District Court's decision be overturned. So requested on this, the 29th day of October, 2015.

  /s/ David Stebbins
David Stebbins
123 W. Ridge St.,
APT D
Harrison, AR 72601
870-204-6516
stebbinsd@yahoo.com

## CERTIFICATE OF COMPLIANCE

This Brief complies substantially with the volume requirements set forth in Fed.R.App.P. 32(a)(7)(B), in that it is under 14,000 words.

According to Appellant's "word count" feature in his word processing document, this document contains 12,750 words, which is well within the 14,000 word limit.

Granted, that word count does not include the three pictures Appellant attached from his original, handwritten complaint to refute the District Court's finding that Appellant did not plead sufficient facts for an unconstitutional custom, but the odds of those three pictures amounting to a thousand words is astronomical, so Appellant will not bother counting them. Besides, the word count *does* include the Table of Contents and Table of Citations, which Rule 32(a)(7)(B)(iii) specifically says is not counted. So it balances out.

   */s/ David Stebbins*
David Stebbins
123 W. Ridge St.,
APT D
Harrison, AR 72601
870-204-6516
stebbinsd@yahoo.com